ORDERED.

**Dated:  August 21, 2017**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

                                  Chapter 11

Cocoa Expo Sports Center, LLC,           Case No.: 6:17-bk-00441-RAC

         Taxpayer ID No. 27-4509245,

           Debtor.

_____/

### ORDER APPROVING DISCLOSURE STATEMENT
### AND CONFIRMING DEBTOR'S CHAPTER 11 PLAN

THIS CASE came before the Court at a hearing on August 17, 2017, to consider and act upon Debtor's: (i) First Amended Plan of Reorganization (the "Plan") (Doc. No. 147); (ii) First Amendment to Plan (Doc. No. 162) (the "Modification"); (iii) First Amended Disclosure Statement (the "Disclosure Statement") (Doc. No. 148); and (iv) Objection to Confirmation by Bank of Washington (the "Bank") (Doc No. 169) (the "Objection"). Definitions of terms in the Plan shall be applicable in this order unless otherwise defined in this order.

The Court finds that:

1.       Debtor filed this Chapter 11 case on January 23, 2017.

2.       The Plan is amended by the Modification and the amendments do not require further disclosure, as follows:

a.    <u>Bank and UDF</u>. Upon the agreement of creditors Bank of Washington (the "Bank") and UDF XIV SPE B, LLC and Urban Development Fund XXIII, LLC (collectively "UDF") announced in open court, within 30 days following the Debtor's execution of the modified notes and mortgages with the Bank, as contemplated under the Plan, in accordance with Section 2(d) of the November 30, 2011 Intercreditor Agreement between UDF and the Bank and the January 23, 2014 Amended and Restated Intercreditor Agreement between UDF and the Bank (collectively, the "IC Agreement"), and the January 23, 2014 Subordination Agreement between UDF and the Bank, UDF shall execute and deliver to the Bank a Reaffirmation Agreement which reaffirms the terms of the IC Agreement and Subordination Agreement as to the modified loan documents and UDF's continued subordination to the Bank.

b.    <u>Unimpaired Classes</u>.  The Plan does not alter the legal, equitable or contractual rights of the holders of Allowed Secured Claims in the following Classes and instead of a renewal note, on the Effective Date, the holders of Allowed Claims will receive cash on account of such Claims in the amount of the Allowed Secured Claim as follows:

| Class | Name | Amount |
|-------|------|--------|
| IX | Armitage Plumbing | $4,389.88 |
| X | Board of County Commissioners | $49,137.01[1] |
| XII | Fortiline Waterworks | $16,812.93 |
| XIII | M&M Electric of Central Florida | $21,274.21 |
| XV | Southern Fire Protection of Orlando | $27,723.70 |

c.    <u>Classes XI, XIV and XVI</u>.  Instead of a renewal note, on the Effective Date, the holders of Allowed Claims shall receive cash on account of such Claims as follows:

| Class | Name | Amount |
|-------|------|--------|
| XI | City Electric Supply Company | $250,000.00 |
| XIV | Middlesex Paving | $250,000.00 |
| XVI | Unsecured Claims | $312,000.00, pro rata |

---

[1] Subject to pending objection (Doc. No. 145).

3.      Under the Plan, as modified by the Modification, the following Classes of Claims are unimpaired and are deemed to have accepted the Plan:  IX, X, XII, XIII, XV.

4.      Attached hereto as **Exhibit A** is the Management Agreement. Debtor may terminate the Management Agreement only in accordance with the terms of the Management Agreement. If the Management Agreement is terminated, with or without cause, by Owner or Manager, and Debtor does not cure the termination within 30 days following the termination, then Debtor shall be in default under the Loan Documents between Bank and Debtor and Bank may exercise all remedies under the Loan Documents and applicable law. Debtor may cure the termination if Debtor retains a replacement manager reasonably acceptable to Bank under a replacement management agreement with terms that have been expressly approved in writing by Bank and are substantially similar to the terms of the Management Agreement.

5.      The Disclosure Statement provides adequate information and otherwise satisfies the requirements of the Bankruptcy Code.

6.      The Bank withdrew the Objection and voted to accept the Plan in Classes VI, VII and VIII, in reliance on the provisions of this order, the execution of the Management Agreement, and the Declaration Regarding Vehicles (Bank Ex. 1).

7.      The Plan satisfies the requirements of Bankruptcy Code §1129(a).

8.      Attached hereto as **Exhibit B** is Debtor's summary of payments under the Plan.

9.      Under the Plan, Debtor will receive transfers of and/or Debtor will grant to Bank of Washington a lien or mortgage against the following real estate (the "Real Estate"): (a) 335 Friday Road, Cocoa, Florida, Parcel ID 760; (b) 5120 Hwy 520, Cocoa, Florida, Parcel ID 758; and (c) 345 Friday Road, Cocoa, Florida, Parcel ID 780. The transfers of the Real Estate to Debtor, the granting of any lien or mortgage against the Real Estate to Bank of Washington, and

the making or delivery of the deeds or mortgages for such transfers are under a confirmed plan and may not be taxed under any law imposing a stamp tax or similar tax, including any tax or charge under Sections 201.02 and 201.08, Fla. Stat.

Based on the foregoing and for the reasons stated and recorded in open court, it is

**ORDERED:**

1.     The Disclosure Statement is approved.

2.     The Plan, as modified by the Modification, is confirmed.

3.     If there is any inconsistency between the Plan, Modification and this order, then the terms of this order shall control.

4.     Until the Court enters the final decree in this case, the Court retains jurisdiction for any and all matters that may come before the Court in the administration of the Plan of Reorganization and pursuant to the Order of Confirmation, specifically including but not limited to, the jurisdiction to determine all objections that have heretofore been or may be filed to claims of creditors herein; to fix and award all compensation to parties who may be so entitled; to hear and determine all questions concerning the assets or property of the Debtor, including any questions relating to any sums of money, services, or property due to the Debtor; and determine all matters of any nature or type necessary or appropriate to carry out the Plan.

5.     If the Debtor fails to follow the provisions of Local Rule 3022-1, then the Debtor shall file a report within ninety (90) days following the date of the Order of Confirmation, setting forth the progress made in consummating the Plan.  The report shall include a statement of:

a.     Distribution by class, name of creditor, date of distribution, and amount paid;

b.     Transfers of property; and

        c.       Affirmation that the Debtor has substantially complied with the provisions of the confirmed Plan.

6.       The reorganized Debtor shall timely pay post-confirmation quarterly fees assessed, pursuant to 28 U.S.C. §1930(a)(6), until such time as this Bankruptcy Court enters a final decree closing this Chapter 11 case, or enters an order either converting this case to a case under Chapter 7 or dismissing this case.  After confirmation, pursuant to 11 U.S.C. §1106(a)(7) and Bankruptcy Rule 2015(a)(5), the reorganized Debtor shall file with the Bankruptcy Court and shall serve on the United States Trustee a financial report or statement of disbursements for each quarter (or portion thereof) that this Chapter 11 case remains open, in a format prescribed by the United States Trustee.

7.       The transfers of the Real Estate to Debtor, and the granting of any lien or Mortgage against the Real Estate to Bank, and the making or delivery of the deeds or mortgages for such transfers are under a confirmed plan and may not be taxed under any law imposing a stamp tax or similar tax, including any tax or charge under Sections 201.02 and 201.08, Fla. Stat.

8.       A Status Conference is scheduled for November 15, 2017, at 11:00 a.m., in Courtroom 6C, 6th Floor, George C. Young Courthouse, 400 West Washington Street, Orlando, Florida 32801.

Attorney David R. McFarlin is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.

**FACILITY MANAGEMENT AGREEMENT**
between
**COCOA EXPO SPORTS CENTER, LLC**
and
**SPORTS FACILITIES MANAGEMENT, LLC**

Dated: August, 2017

17th

1

**EXHIBIT A**

## FACILITY MANAGEMENT AGREEMENT

THIS FACILITY MANAGEMENT AGREEMENT (the "Agreement") is made and entered into this *17th* of *Aug*, 2017 (the "Effective Date"), by and between Cocoa Expo Sports Center, LLC, (the "Owner") and Sports Facilities Management, LLC, a Florida limited liability company (the "Manager").

### RECITALS

WHEREAS, Owner owns the infrastructure, buildings, parking, lighting, sports playing surfaces, sports equipment, and all other assets associated with the athletic complex as the same exist now or may exist in the future including improvements related thereto specifically located at 500 Friday Road, Cocoa, Florida, and on adjacent properties, as the same exist now or may exist in the future, known as the "Cocoa Expo Sports Center " or any other name that may be identified in the future ("Facility");

WHEREAS, Manager has expertise in providing management services for athletic complex facilities throughout the United States;

WHEREAS, Owner has expertise and extensive experience in designing, permitting, building, creating, managing and operating athletic complex facilities and their sports programs;

WHEREAS, Owner has designed, constructed, built, currently operates, maintains the Facility, and has done so since 2012;

WHEREAS, Owner wishes to increase its income by hiring Manager to market, manage and operate and bring additional occupants over and above its current volume to their facility for short and long term stays;

WHEREAS, Owner and Manager desire Sports Facilities Management, LLC to market, manage and operate the Facility subject to the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the promises and covenants herein contained and other good and valuable consideration, the receipt of which is hereby acknowledged, Owner and Manager agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1. **Definitions.** For purposes of this Agreement, the following terms have the meanings referred to in this Section:

**Affiliate:**  A person or company that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified person or company.

**Agreement:**  The "Agreement" shall mean this Management Agreement, together with all exhibits attached hereto (each of which are incorporated herein as an integral part of this Agreement), as amended, supplemented or restated from time to time.

**Capital Expenditures:**  All expenditures for building additions, alterations,  repairs or improvements and for purchases of additional or replacement furniture, machinery,  or equipment,  where the cost of such expenditure is greater than Five Thousand Dollars ($5,000) and the depreciable life of the applicable item is, according to generally accepted accounting principles, in excess of five (5) years.

**Commencement Date:** shall have the meaning given to such term in Section 4.1 below.

**Commercial Rights:** Naming rights, pouring rights, advertising, sponsorships, the branding of food and beverage products for resale and memorial gifts at or with respect to the Facilities.

**Effective Date:** "Effective Date" shall have the meaning ascribed to such term ~~in the preamble of this Agreement.~~ *the Amended* Plan of Reorganization Filed by Jeffrey Unnerstall.

**Emergency Repair:** The repair of a condition which, if not performed immediately, creates an imminent danger to persons or property and/or an unsafe condition at the Facility threatening persons or property.

**Event of Force Majeure:** An act of God, fire, earthquake, hurricane, flood, riot, civil commotion, terrorist act, terrorist threat, storm, washout, wind, lightning, landslide, explosion, epidemic, inability to obtain materials or supplies, accident to machinery or equipment, any law, ordinance, rule, regulation, or order of any public or military authority stemming from the existence of economic or energy controls, hostilities or war, a labor dispute which results in a strike or work stoppage affecting the Facility or services described in this Agreement, or any other cause or occurrence outside the reasonable control of the party claiming an inability to perform and which by the exercise of due diligence could not be reasonably prevented or overcome.

**Existing Contracts:** Service Contracts, Revenue Generating Contracts, and other agreements relating to the day-to-day operation of the Facilities existing as of the Effective Date.

**Facility:** The "Facility" shall have the meaning ascribed to such term in the Recitals to this Agreement.

**FF&E:** Furniture, fixtures and equipment which has been or will be procured for use at the Facilities.

**General Manager:** The employee of Manager acting as the full-time on-site general manager of the Facilities.

**Laws:** Means all applicable laws, statutes, rules, regulations and ordinances.

**Management-Level Employees:** The General Manager, Marketing Manager, Operations Manager, Membership Manager, Finance Manager, and Sports Programming Manager.

**Manager:** The term "Manager" shall have the meaning ascribed to such term in the beginning paragraph of this Agreement.

**Operating Account:** A separate interest-bearing account in the name of the Owner at a licensed bank, to be designated by the Manager, where Revenue is deposited and from which Operating Expenses are paid.

**Operating Budget:** A line item budget for the Facility that includes a projection of Revenues and Operating Expenses, presented on a monthly and annual basis.

**Operating Expenses:** All expenses incurred by Manager in connection with its operation, promotion, maintenance and management of the Facilities, including but not limited to the following: (i) employee payroll, bonuses and benefits (including payments to any national benefit system, relocation costs, termination costs (including severance costs and payments in lieu of termination), and related costs, (ii) cost of operating supplies, including general office supplies, (iii) advertising, marketing, group sales, and public relations costs, (iv) cleaning expenses, (v) data processing costs, (vi) dues, subscriptions and membership costs, (vii) the Fixed Management Fee, (viii) printing and stationary costs, (ix) postage and freight costs, (x) equipment rental costs, (xi) minor repairs, maintenance, and equipment servicing, not including expenses relating to performing capital improvements or repairs, (xii) security expenses, (xiii) telephone and communication charges, (xiv) travel and entertainment expenses of Manager employees, (xv) cost of employee uniforms and identification, (xvi) exterminator and trash removal costs, if applicable (xvii) computer, software, hardware and training costs, (xviii) parking expenses, (xix) utility expenses, (xx) office expenses, (xxi) ) audit and accounting fees, (xxii) legal fees, (xxiii) all bond and insurance costs, including but not limited to personal property, liability, and worker's compensation insurance, (xxiv) commissions and all other fees payable to third parties ( *e.g.* commissions relating to food, beverage and merchandise concessions services and commercial rights sales), (xxv) cost of complying with any Laws, (xxvi)

costs incurred by Manager to settle or defend any claims asserted against Manager arising out of its operations at the Facilities on behalf of Owner; (xxvii) loss, costs, damage, liability and any other obligations arising under or incurred under Service Contracts and other agreements relating to Facility operations, and (xxviii) Taxes. The term "Operating Expenses" does include debt service on the Facility, but does not include Capital Expenditures or any Incentive Fees (all of which shall be the responsibility of the Owner).

**Operating Year:** Each twelve (12) month period during the Term, commencing on January 1 and ending on December 31, provided that the first Operating Year shall be a shortened year commencing on the Commencement Date and ending on December 31st of that year and the last Operating Year shall be a shortened year, ending upon the expiration of this Agreement.

**Operations Manual:** The document has been developed by Manager, which shall contain terms regarding the management and operation of the Facility including detailed policies and procedures to be implemented in operating the Facility.

**Owner:** The term "Owner" shall have the meaning ascribed to such term in the beginning paragraph to this Agreement.

**Recruitment Fee:** The term "Recruitment Fee" shall have the meaning ascribed to such term in <u>Section 6.4</u> of this Agreement.

**Regulatory Approvals:** All applicable governmental or regulatory approvals, authorizations, consents, licenses or permits.

**Revenue:** All revenues generated by Manager's operation of the Facility, including but not limited to event ticket proceeds income, rental and license fee income, merchandise income, gross food and beverage income, gross income from any sale of Commercial Rights, gross service income, equipment rental fees, box office income, and miscellaneous operating income, but shall not include event ticket proceeds held by Manager in trust for a third party and paid to such third party.

**Revenue Generating Contracts:** Vendor, concessions and merchandising agreements, user/rental agreements, booking commitments, licenses, and all other contracts or agreements generating revenue for the Facility and entered into in the ordinary course of operating the Facility.

**Service Contracts:** Agreements for services to be provided in connection with the operation of the Facility, including without limitation agreements for consulting services, ticketing, web development and maintenance, computer support services, FF&E purchasing services, engineering services, electricity, steam, gas, fuel, general maintenance, HVAC maintenance, telephone, staffing personnel including guards, ushers and ticket-takers, extermination, elevators, stage equipment, fire control panel and other safety equipment, snow removal and other services which are deemed by Manager to be either necessary or useful in operating the Facility.

**Taxes:** Any and all governmental assessments, franchise fees, excises, license and permit fees, levies, charges and taxes, of every kind and nature whatsoever, which at any time during the Term may be assessed, levied, or imposed on, or become due and payable out of or in respect of, (i) activities conducted on behalf of the Owner at the Facility, including without limitation the sale of concessions, the sale of tickets, and the performance of events (such as any applicable sales and/or admissions taxes, use taxes, excise taxes, occupancy taxes, employment taxes, and withholding taxes), or (ii) any payments received from any holders of a leasehold interest or license in or to the Facility, from any guests, or from any others using or occupying all or any part of the Facility.

**Term:** The term "Term" shall have the meaning ascribed to such term in Section 4.1 of this Agreement.

**Termination Fee:** The term "Termination Fee" shall have the meaning ascribed to such term in Section 4.3(a) of this Agreement.

4

## ARTICLE 2
## SCOPE OF SERVICES

2.1     **Engagement**.

(a)     Owner hereby engages Manager during the Term to act as the sole and exclusive manager and operator of the Facility,  subject to and as more fully described in this Agreement,  and, in connection therewith, to perform the services described herein and in Exhibits A and B attached hereto.

(b)     Manager hereby accepts such engagement, and shall perform the services described herein, subject to the limitations expressly set forth in this Agreement.

2.2     **Limitations on Manager's Duties**.  Manager's obligations under this Agreement are contingent upon and subject to the Owner making available, in a timely fashion, the funds budgeted for and/or reasonably required by Manager to carry out such obligations during the Term.  Manager shall not be considered to be in breach or default of this Agreement, and shall have no liability to the Owner or any other party, in the event Manager does not perform any of its obligations hereunder due to failure by the Owner to timely provide such funds.

## ARTICLE 3
## COMPENSATION

3.1     **Management Fees**.   In consideration of Manager's performance of its services hereunder, Owner shall pay Manager those payments as further set forth in Exhibit B attached hereto.

## ARTICLE 4
## TERM; TERMINATION

4.1     **Term**. The term of this Agreement (the "Term") shall begin on the Effective Date and, unless sooner terminated pursuant to the provisions of Section 4.2 below, shall expire on the fourth (4th) anniversary of the Effective Date.

4.2     **Termination**. This Agreement may be terminated by Manager for any reason upon 120 days advance written notice to Owner and Bank of Washington ("BOW"). Owner may terminate this Agreement without Cause only with the express written consent of ("BOW") and upon 120 days advance written notice to Manager. Owner may terminate this Agreement with Cause, at any time by providing Manager and BOW with thirty (30) advance written notice. In all such instances, the date of termination shall hereinafter be referred to as the "Termination Date".

As used herein, the term "*Cause*" necessary for the Owner to terminate this Agreement shall mean one of the following events:

(a)     Manager's theft, conversion, embezzlement or misappropriation of the Facility's funds;

(b)     Any act of Manager involving fraud or dishonesty;

(c)     Manager's commission of a felony; or

(d)     Manager commits a material breach of this Agreement.

If an event constituting Cause occurs, the Owner shall provide Manager and BOW with written notice of such Cause, and Manager shall have thirty (30) days after receipt of such notice in which to cure the Cause; ~~provided, however, that the Cause shall be deemed to be cured if Manager commences to cure the Cause within fifteen (15) days and thereafter pursues such cure to completion.~~ If the Cause has not been cured in thirty (30) business days, the Owner may terminate the Agreement ~~by giving another written notice to Manager and BOW~~

~~of such termination. The termination shall take effect thirty (30) days after receipt of such second written notice by Manager and BOW.~~

4.3    **Effect of Termination.**

(a)    Upon termination by the Owner for any reason other than for "cause" due to Manager's breach of any material provision herein, without cure by Manager following written notice from Owner detailing such breach of this Agreement, Owner shall pay to Manager a termination fee (the "Termination Fee") on the Termination Date that is equal to (a) the greater of: (i) one- half (1/2) of the trailing twelve (12) months' fees due to Manager hereunder or (ii) six (6) times the average monthly payment due to Manager during the Term; plus (b) any bonus or incentive payments that the Manager has earned through the Termination Date; plus (c) six (6) months' salary for all full- time employees of Manager that have been employed pursuant to the terms of this Agreement; plus (d) any severance payments and/or relocation expenses which are incurred by Manager related to the Manager's terminating or relocating full-time employees that have been assigned to the Facility. In the Event that Owner terminates this Agreement, Owner shall have the right to request that Manager vacate the property and cease all management activities related to the Facility, in which case Owner shall pay Manager the Termination Fee as set forth above. Notwithstanding anything contained herein to the contrary, in the event that Owner provides Manager with one hundred and twenty (120) days' notice of termination, Manager and Owner hereby acknowledge and agree that the Termination Fee shall be waived.

(b)    Upon termination or expiration of this Agreement for any reason, (i) Manager shall promptly discontinue the performance of all services hereunder, (ii) the Owner shall promptly pay Manager all fees due Manager up to the date of termination or expiration (subject to proration if the Term ends other than at the end of the Operating Year), (iii) Manager shall make available to the Owner and BOW all data, electronic files, documents, procedures, reports, estimates, summaries, and other such information and materials with respect to the Facilities as may have been accumulated by Manager in performing its obligations hereunder, whether completed or in process, and (iv) without any further action on part of Manager or Owner, the Owner shall, or shall cause the successor Facility manager to, assume all obligations arising after the date of such termination or expiration, under any Service Contracts, Revenue Generating Contracts, booking commitments and any other Facility agreements entered into by Manager in furtherance of its duties hereunder. Notwithstanding the foregoing, Manager is under no duty to provide certain proprietary confidential materials or intellectual property to the Owner, including but not limited to national benchmarking formulas, key performance indicators reports, employee manuals, employee training materials, employee performance evaluations, financial forecasting formulas, Manager's internal databases or contact lists, Manager's operations manuals, and/or other intellectual property developed by and maintained by the Manager and which it may use in its regular course of business to provide services to clients similar to Owner. Any obligations of the parties that are specifically intended to survive expiration or termination of this Agreement shall survive expiration or termination hereof.

**ARTICLE 5**
**OWNERSHIP; USE OF THE FACILITY**

5.1    **Ownership of Facility, Data, Equipment and Materials.** The Owner will at all times retain ownership of the Facilities, including but not limited to real estate, technical equipment, furniture, displays, fixtures and similar property, including improvements made during the Term, at the Facility and all of Facility specific intellectual property and proprietary information or data. Any data, equipment or materials furnished by Owner to Manager or acquired by Manager as an Operating Expense shall remain the property of Owner, and shall be returned to Owner when no longer needed by Manager to perform under this Agreement. Notwithstanding the above, Owner shall not have the right to use any third party software licensed by Manager for general use by Manager at the Facility and other facilities managed by Manager, the licensing fee for which is proportionately allocated and charged to the Facility as an Operating Expense; such software may be retained by Manager upon expiration or termination hereof. Furthermore, Manager recognizes that the Operations Manual, separate and apart from any facility specific documents, has been previously developed and used by Manager hereunder and is

proprietary to Manager, and shall belong to Manager at the end of the Term; Owner shall not use or maintain copies thereof upon the end of the Term. As an example: The Facility Operations Manual will be customized specific to the Facility and be property of the Facility.

5.2    **Right of Use by Manager.** The Owner hereby gives Manager the right and license to use the Facility for the Term, and Manager accepts such right of use, for the purpose of performing the services herein specified, including the operation and maintenance of all physical and mechanical facilities necessary for, and related to, the operation, maintenance and management of the Facility. The Owner shall provide Manager with a sufficient amount of suitable office space in the Facility (exact office space to be mutually agreed by the parties) and with such office equipment as is reasonably necessary to enable Manager to perform its obligations under this Agreement. In addition, the Owner shall make available to Manager, at no cost, parking spaces adjacent to the Facility for all of Manager's full-time employees and for the Facility's event staff.

5.3    **Right of Use of Staff by Manager.** Manager shall have the right to utilize its employees as needed to support Manager's organization as a whole, including but not limited to travel for training and temporary staffing coverage.  Manager shall have the right to utilize the Facility to host events for its employees of the Facility from time to time for the purpose of learning and development, at no cost to the operational budget other than that incurred by the staff who are regularly stationed at the Facility.

5.4    **Observance of Agreements.**  The Owner agrees that Manager shall pay, keep, observe and perform all payments, terms, covenants, conditions and obligations under any leases, bonds, debentures, loans and other financing, security agreements and any court orders to which the Owner is bound in connection with its ownership of the Facility.

**ARTICLE 6**
**PERSONNEL**

6.1    **Generally.** All Facility staff and other personnel shall be engaged or hired by Manager, in its sole discretion, except that Manager agrees to hire Jeff Unnerstall and four (4) of his children and these and all other employees at the Facility shall be employees, agents or independent contractors of Manager, and not of the Owner at salaries of (**TBD**). Any agreed upon salaries to family members of Jeff Unnerstall shall be paid last each month, only if all Operating Expenses for the Facility are paid current. Said salaries shall not exceed the salaries that were paid to said family members as of June 15, 2017 (Jeff Unnerstall shall be paid a salary of $6,000 per month). All such employees shall be at-will employees and treated in all respects as any other employee of Manager.  Manager shall select any other employees, in its sole discretion.  The Operating Budget, which shall be subject to Owner's approval, shall define the number,  function, qualifications,  and compensation,  including salary and benefits,  of its employees and shall control the terms and conditions of employment (including without limitation termination thereof)  relating to such employees. Manager agrees to use reasonable and prudent judgment in the selection and supervision of such personnel. Owner specifically agrees that Manager shall be entitled to pay its employees, as an Operating Expense, bonuses and benefits in accordance with Manager's then current employee manual, which may be modified by Manager from time to time in its sole discretion. A copy of Manager's current employee manual and any Facility-specific employee manual supplement shall be provided to Owner.

6.2    **General Manager and Management-Level Employees.**  Personnel engaged by Manager will include a full-time on-site General Manager and other Employees. The General Manager will have general supervisory responsibility for Manager and will be responsible for day-to-day operations of the Facility, supervision of employees, and management and coordination of all activities associated with events taking place at the Facility.

6.3    **Work Environment**.  Employees will be required to work to the standards outlined in the most current version of Manager's employee handbook.  Owner shall not require employees of Manager to vary from those employment standards either directly, or indirectly through impacting decisions, including but not limited to not funding the correct staffing level, not providing safe work tools and a safe work environment, or an environment inconsistent with Manager's values.

7

6.4    **Post-Termination Employment.** In the event of termination, or in any case where Owner expresses an interest in hiring Manager's key employee(s), which shall be defined as the top 4 most highly compensated employees assigned to the Facility, except any person employed by Owner prior to the date of this Agreement,, Manager shall reserve the right to agree or deny such a request. In the event that Manager elects to permit Owner to hire Manager's employee(s), Owner shall provide Manager with a one-time fee (the "Recruitment Fee") equal to six (6) months' gross salary and benefits. All other onsite employees shall be available for hire by Owner at Owner's discretion without cost to Owner.

## ARTICLE 7
## PROCEDURE FOR HANDLING INCOME

7.1    **Operating Account.** All Revenue derived from operation of the Facility shall be deposited by Manager into the Operating Account as soon as practicable upon receipt (but not less often than once each business day). The specific procedures (and authorized individuals) for making deposits to and withdrawals from such account shall be set forth in the Operations Manual, but the parties specifically agree that Manager shall have the authority to sign checks and make withdrawals from such account without needing to obtain the co-signature of Owner or his representative. Owner can pay for any Facility bills up to $1,000, but any greater amounts require the Manager's approval and co-signature. The Owner will have visibility to all accounts owned by the Facility.

## ARTICLE 8
## FUNDING

8.1    **Source of Funding.** Manager shall pay all Operating Expenses for the operation, maintenance, supervision and management of the Facility from the funds in the Operating Account, which Manager shall maintain and control. The Operating Account shall be funded with amounts generated by operation of the Facility (as described in Article 7 above), or otherwise made available by the Owner. To ensure sufficient funds are available in the Operating Account, Owner will deposit in the Operating Account, on or before the Commencement Date, the balance of any remaining Sale Proceeds from the Neptune Bay Property Sale as defined in ARTICLE VII A of the Jeff Unnerstall Chapter 11 Amended Plan, Case No. 6:17-bk-00336 for the month beginning on the Commencement Date. The Owner shall thereafter, on or before the first (1st) day of each succeeding month following the Commencement Date, deposit (or allow to remain) in the Operating Account the budgeted or otherwise approved expenses for each such month. Manager will provide to Owner the budget for the month not less than 15 days prior to the beginning of the month. Manager shall have no liability to the Owner or any third party in the event Manager is unable to perform its obligations hereunder, or under any third party contract entered into pursuant to the terms hereof, due to the fact that sufficient funds are not made available to Manager to pay such expenses in a timely manner.

8.2    **Advancement of Funds.** Under no circumstances shall Manager be required to pay for or advance any of its own funds to pay for any Operating Expenses. In the event that, notwithstanding the foregoing, Manager agrees to advance its own funds to pay Operating Expenses, Owner shall promptly reimburse Manager for the full amount of such advanced funds, plus interest at a rate to be mutually agreed upon. Owner will also fund an amount to be included in the budget, that will be accounted for as Owner's asset, to be used as operating funds and working capital. The "working capital" will be the baseline account balance for the Operating Account and Owner will contribute funds as needed to maintain that minimum of amount in the Operating Account.

## ARTICLE 9
## FACILITY CONTRACTS; TRANSACTIONS WITH AFFILIATES

9.1    **Existing Contracts.** The Owner shall provide to Manager, on or before the Effective Date, full and complete copies of any Existing Contracts. Manager shall administer and use reasonable commercial efforts to assure compliance with such Existing Contracts to the extent provided to Manager. Owner currently manages and operates numerous baseball and softball travel ball tournaments. Manager acknowledges and agrees that owner has relationships with teams in Florida which will facilitate required attendance for successful short term travel ball tournaments. Manager shall manage and operate the travel ball tournaments in cooperation and with the assistance and best efforts, of Owner.to retain any existing tournament business for the benefit of the Facility.

9.2 **Execution of Contracts.** Manager shall have the right to enter into Service Contracts, Revenue Generating Contracts and other contracts related to the operation of the Facility, as agent on behalf of the Owner. Manager shall use its best efforts to use the most cost-effective approaches for maintenance, housekeeping and overall operation of the Facility, either run in house or contracted for with outside vendors, to keep the property at least the same standard of quality and repair as it was prior to the execution of this Agreement. Any such material agreements shall contain standard indemnification and insurance obligations on the part of each vendor, licensee or service provider, as is customary for the type of services or obligations being provided or performed by such parties.

9.3 **Transactions with Affiliates.** In connection with its obligations hereunder relating to the purchase or procurement of services for the Facility (including without limitation food and beverage services, ticketing services and Commercial Rights sales), Manager may purchase or procure such services, or otherwise transact business with, an Affiliate of Manager, provided that the prices charged and services rendered by such Affiliate are competitive with those obtainable from any unrelated parties rendering comparable services. Manager shall, if requested by Owner, provide reasonable evidence establishing the competitive nature of such prices and services, including if appropriate, competitive bids from other persons seeking to render such services at the Facility.

## ARTICLE 10
## AGREEMENT MONITORING AND GENERAL MANAGER

10.1 **Contract Administrator.** Each party shall appoint a contract administrator who shall monitor such party's compliance with the terms of this Agreement. Manager's contract administrator shall be its General Manager at the Facility, unless Manager notifies Owner of a substitute contract administrator in writing. Owner's contract administrator shall be the CEO or the VP of Owner. Owner shall notify Manager of the name of its contract administrator within thirty (30) days of execution hereof. Any and all references in this Agreement requiring Manager or Owner participation or approval shall mean the participation or approval of such party's contract administrator.

## ARTICLE 11
## INSURANCE

11.1 **Types of Coverage; Certificates of Insurance.** Manager and Owner agree that Manager will obtain insurance coverage in the manner and amount as set forth herein. Owner and Manager shall upon execution of this Agreement furnish to the other party certificates of all required insurance as well as certificates of renewal no later than thirty (30) days prior to the expiration of each policy. Such insurance policies (as reflected by certificate) held by Owner or Manager shall provide that that the other party and BOW are additionally named insureds and no cancellation or non-renewal can take effect without thirty (30) days' prior written notice by registered mail to Manager.

11.2 **Policies.** Manager shall be responsible for obtaining and administering insurance, as an Operating Expense, in connection with the Facility as follows:

(a) Property Insurance. Manager shall also procure and maintain fire and extended coverage casualty insurance, and (if appropriate) flood insurance, regarding the Facility.

(b) General Liability. Manager shall procure, and maintain as an Operating Expense of the Facility, a general liability policy (including contractual liability insurance, including an umbrella policy, and including hired, non-owned auto coverage, and abuse and molestation coverage) which insures Manager and which includes Owner as an additional named insured, with a general liability policy (including contractual liability insurance) with a combined single limit of $1,000,000 per occurrence and a general annual aggregate limit of at least $3,000,000. All such insurance shall be on an occurrence basis.

9

(c)    Professional Liability. Manager shall procure and maintain, as an Operating Expense, a professional liability policy which insures Owner as an additional named insured.

(d)    Workers' Compensation. Manager shall procure and maintain as an Operating Expense worker's compensation insurance required under applicable Florida state law.

## ARTICLE 12
## COVENANTS AND REPRESENTATIONS

12.1    <u>**Owner's Covenants and Representations.**</u>    Owner makes the following covenants and representations to Manager based upon the actual knowledge of Owner, which covenants and representations shall, unless otherwise stated herein, survive the execution and delivery of this Agreement:

(a)    Owner's Status.    Owner is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Florida and authorized to transact business throughout the United States with full corporate power to enter into this Agreement and execute all documents required hereunder.

(b)    Authorization. The making, execution, delivery, and performance of this Agreement by Owner has been duly authorized and approved by requisite action, and this Agreement has been duly executed and delivered by Owner and constitutes a valid and binding obligation of Owner, enforceable in accordance with its terms and applicable laws.

(c)    Effect of Agreement. To Owner's actual knowledge, without duty of inquiry, neither the execution and delivery of this Agreement by Owner nor Owner's performance of any obligation hereunder: (i) will constitute a violation of any law, ruling, regulation, or order to which Owner is subject; or (ii) shall constitute a default of any term or provision or shall cause an acceleration of the performance required under any other agreement or document (A) to which Owner is a party or is otherwise bound, or (B) to which the Facility or any part thereof is subject.

(d)    Ownership Rights. Owner shall obtain and retain the property interests in the Facility necessary to enable Manager to perform its duties pursuant to this Agreement peaceably and quietly. Owner represents and warrants that Manager's performance of the services required by this Agreement shall not violate the property rights or interests of any other Person.

(e)    Documentation.    If necessary to carry out the intent of this Agreement, Owner agrees to execute and provide to Manager, on or after the Effective Date, any and all other instruments, documents, conveyances, assignments, and agreements which Manager may reasonably request in connection with the operation of the Facility.

12.2    <u>**Manager's Covenants and Representations.**</u>    Manager makes the following covenants and representations to Owner, which covenants and representations shall, unless otherwise stated herein, survive the execution and delivery of this Agreement:

(a)    Corporate Status. Manager is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Florida and authorized to transact business throughout the United States with full corporate power to enter into this Agreement and execute all documents required hereunder.

(b)    Authorization. The making, execution, delivery, and performance of this Agreement by Manager has been duly authorized and approved by all requisite action of the board of directors of Manager, and this Agreement has been duly executed and delivered by Manager and constitutes a valid and binding obligation of Manager, enforceable in accordance with its terms and applicable laws.

(c)    Effect of Agreement. To Manager's best knowledge, without duty of inquiry, neither the execution and delivery of this Agreement by Manager nor Manager's performance of any obligation hereunder (i) will constitute a violation of any law, ruling, regulation, or order to which Manager is subject; or (ii) shall constitute a

default of any term or provision or shall cause an acceleration of the performance required under any other agreement or document to which Manager is a party or is otherwise bound.

12.3   **Indemnification.**

(a)   Indemnification by Manager.  Manager agrees to defend,  indemnify and hold harmless the Owner and its Affiliate companies,  and each of their respective directors,  officers, employees, agents,  successors and assigns against any claims,  causes of action,  costs,  expenses (including reasonable attorneys' fees) liabilities,  or damages (collectively,  "Losses")  suffered by such parties,  arising out of or in connection with any (i) grossly negligent act or omission, or willful misconduct, on the part of Manager or any of its employees or agents in the performance of its obligations under this Agreement;  or (b)  breach by Manager of any of its representations, covenants or agreements made herein.

(b)   Indemnification by Owner. Owner agrees to defend, indemnify and hold harmless Manager,  its parent,  subsidiary and Affiliate companies,  and each of their respective directors,  officers, employees, agents, successors and assigns (for the purposes of this Section 12.3 collectively the "Indemnified Persons"), against any Losses suffered by any Indemnified Person, [arising out of or in connection with this Agreement unless due to the grossly negligent act or omission or willful misconduct on the part of the Indemnified Person].

(c)   Conditions to Indemnification.  With respect to each separate matter brought by any third party against which a party hereto ("Indemnitee") is indemnified by the other party ("Indemnitor") under this Section,  the Indemnitor shall be responsible,  at its sole cost and expense,  for controlling,  litigating, defending and/or otherwise attempting to resolve any proceeding,  claim,  or cause of action underlying such matter, except that (a) the Indemnitee may, at its option, participate in such defense or resolution at its expense and through counsel of its choice; (b) the Indemnitee may, at its option, assume control of such defense or resolution if the Indemnitor does not promptly and diligently pursue such defense or resolution, provided that the Indemnitor shall continue to be obligated to indemnify the Indemnitee hereunder in connection therewith; and (c)  neither Indemnitor nor Indemnitee shall agree to any settlement without the other party 's prior written consent (which shall not be unreasonably withheld or delayed).  In any event, Indemnitor and Indemnitee shall in good faith cooperate with each other and their respective counsel with respect to all such actions or proceedings, at the Indemnitor's sole expense. With respect to each and every matter with respect to which any indemnification may be sought hereunder, upon receiving notice pertaining to such matter, Indemnitee shall promptly (and in no event more than ten (10) days after any third party litigation is commenced asserting such claim) give reasonably detailed written notice to the Indemnitor of the nature of such matter and the amount demanded or claimed in connection therewith.

(d)   Survival. The obligations of the parties contained in this Section shall survive the termination or expiration of this Agreement.

### ARTICLE 13
### MISCELLANEOUS

13.1   **Relationship.**  Manager and Owner shall **not** be construed as joint venturers or general partners of each other, and neither shall have the power to bind or obligate the other party except as set forth in this Agreement. Manager understands and agrees that the relationship to Owner is that of independent contractor, and that it will not represent to anyone that its relationship to Owner is other than that of independent contractor. Nothing herein shall deprive or otherwise affect the right of either party to own, invest in, manage or operate property, or to conduct business activities, which are competitive with the business of the Facility.  Manager covenants and agrees that even though it may have a management responsibility for other similar properties, which from "time to time" may be competitive with the Facility, Manager shall always represent the Facility fairly and deal with Owner on an equitable basis. Nothing in this paragraph, shall be construed to limit Manager's ability to comply as may be necessary any government statute, regulation or any court order ~~or to accept appointment by a court at any point to manage the Facility~~.

Manager has the right to display its brand and marks in the Facility and on the Facility's marketing materials in a manner that does not exceed 10% of the overall impression of the Facility's own brand. Manager has

the right to use and store the database and contact information of the customers of the Facility. Manager will provide from time to time images and other marketing material that it owns and holds the license to for use by the Facility. Owner agrees not to use those images and that material in any manner outside of the operation of the Facility while Manager is engaged to operate it. Manager has the right to use images and marks from the Facility for its own marketing and promotions material in perpetuity, without restriction.

13.2    **Representations**. Owner represents and warrants: (i) that Owner has full power and authority to enter this Agreement; (ii) that to Owner's actual knowledge, the property on which the Facility is located is zoned for the intended use; (iii) that all permits for the operation of the Facility have or will be secured and are or will be current; (iv) that the Facility and its operation do not violate any applicable statues, laws, ordinances, rules, regulations, orders, or the like (including, but not limited to, those pertaining to hazardous or toxic substances); and (v) that no unsafe condition exists (It is understood and agreed that inherently outdoor sports complexes contain surfaces in and around the complex including buildings that may be unlevel and contain irregular surfaces which could result in a fall or tripping hazard and unsafe conditions).

13.3    **Assignment**. This Agreement shall not be assigned by either party without the express written consent of the non-assigning party and BOW. Any such assignment made without proper consent shall be deemed void.

13.4    **Benefits and Obligations**. The covenants and agreements herein contained shall inure to the benefit of, and be binding upon the parties hereto and their respective heirs, executors, successors, and assigns.

13.5    **Fees for Legal Advice**. Manager shall pay, as part of the Operating Expenses of the facility reasonable expenses incurred by Manager in obtaining legal advice regarding compliance with any law affecting the Facility or any activities related to it.

13.6    **Fees for Other Professional Services**. Manager shall pay, as part of the Operating Expenses of the Facility reasonable expenses incurred by Manager in obtaining financial advice, tax and audit advice, code compliance and engineering advice, regarding compliance with any law affecting the Facility or any activities related to it.

13.7    **Building Compliance**. Manager does not assume and is given no responsibility for compliance of the Facility or any equipment therein with the requirements of any building codes or with any statute, ordinance, law, or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owner promptly, or forward to Owner promptly, any complaints, warnings, notices, or summonses received by Manager relating to such matters. Owner represents that to the best of Owner's knowledge, the Facility and all such equipment contained therein comply with all such requirements, and Owner authorized Manager to disclose the ownership of the Facility to any such officials and agrees to indemnify and hold Manager, its representatives, servants, and employees, harmless of and from all loss, cost, expense, and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statues, or regulations.

13.8  **Notices**. All notices provided for in this Agreement shall be in writing and served by registered or certified mail, return receipt requested, postage prepaid, at the following addresses until such time as written notice of a change of address is given to the other party:

If to Owner:                          Cocoa Expo Sports Center, LLC
                                      Attn: J.C. Unnerstall
                                      500 Friday Road
                                      Cocoa, Florida 32926

With a copy to:                       South Millhouse, P.A.
                                      Attn: Jeffrey P. Millhouse, Esq.
                                      Gateway Center
                                      1000 Legion Place, Ste. 1200

Orlando, Florida 32801
Email: jeffm@southmilhausen.com

With a copy to:

Bank of Washington
Attn: L.B. Eckelkamp, Jr.
200 West Main St.
Washington, MO 63090

Eckelkamp Kuenzel LLP
Attn: Steven P. Kuenzel, Sr.
200 West Main St., 2ND FL.
Washington, MO 63090
Email:  steve@eckelkampkuenzel.com

If to Manager:

Sports Facilities Management, LLC
Attn: Jason Clement, Manager
600 Cleveland Street, Suite 910
Clearwater, FL 33755
Email: jclement@sportadvisory.com

With a copy to:

Bruce Rector
General Counsel
Sports Facilities Management, LLC
600 Cleveland Street, Suite 910
Clearwater, FL 33755
Email: brector@sportadvisory.com

13.9     **Interest on Unpaid Sums.** Any sums due Manager under any provision of this Agreement, and not paid by Owner within forty-five (45) days after such sums have become due, shall bear interest at the maximum rate allowable under Florida law, currently eighteen percent (**18.0%**) per year.

13.10     **Owner Responsible for Payments.** Upon termination of or withdrawal from this Agreement, Owner shall assume the obligations of any contract or outstanding bill executed by Manager under this Agreement for and on behalf of Owner and responsibility for payment of all unpaid bills.

13.11     **Headlines.**   All headings and subheadings employed within this Agreement and in the accompanying schedules and exhibits are inserted only for convenience, ease of reference, and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.12     **Force Majeure.**   Any delays in the performance of any obligation of Manager under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, strikes, labor disputes, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Manager and any time periods required for performance shall be extended accordingly.

13.13     **Entire Agreement.** This Agreement, including any specified attachments, constitutes the entire agreement between Owner and Manager with respect to the management and operation of the Facility and supersedes and replaces any and all previous management agreements entered into or/and negotiated between Owner and Manager relating to the Facility covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owner and Manager. Except as otherwise provided herein, any and all amendments, additions, or deletions to this Agreement shall be null and void unless approved by Owner and Manager in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties,  representations,  covenants,  or agreements, express or implied, to

such party, other than those expressly set forth herein, and that each party, in entering into and executing this Agreement, has relied upon no warranties, representations, covenants, or agreements, express or implied, to such party, other than those expressly set forth herein.

13.14    **Rights Cumulative; No Waiver.** No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties may be exercised from "time to time" and as often as may be deemed expedient by those parties.

13.16    **Applicable Law**. The execution, interpretation, and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of Florida. Any civil action or legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the courts of record of the State of Florida in Orange County or the United States District Court, Middle District of Florida. Each party consents to the sole and proper jurisdiction of such court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such court.

13.17    **Acknowledgement.**    The parties hereto acknowledge that they have been provided with a copy of this Agreement for review prior to signing it, that they have been given the opportunity to review it prior to signing it, that they have been given the opportunity to have this Agreement reviewed by their attorney prior to signing it, and that they understand the purposes and effect of this Agreement.

13.18    **Severability.** If any provision or provisions of this Agreement shall be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed and enforced as if such provision or provisions had not been included.

13.19    **Intellectual Property.** Owner acknowledges that Manager has certain intellectual property, trade secrets and proprietary business techniques ("Intellectual Property ") that it will on behalf of Owner to meet its obligations under this Agreement. Owner acknowledges that it obtains no ownership rights whatsoever in the Intellectual Property and, upon termination of this Agreement, Manager shall retain all rights to the Intellectual Property and remove such Intellectual Property from the Facility and its operations. For purposes of this Agreement, the term Intellectual Property shall include, without limitation, analytical tools and documented procedures for forecasting, performance tracking, operational and marketing systems that are unique to Manager's approach, staff training programs, program curriculum and agendas, rights to certain discounts or programs that Manager has negotiated for Manager-operated facilities, and other intellectual property which Manager has previously introduced to the Facility and of which Manager is an author. Notwithstanding all Facility-specific intellectual property created from and at the Facility during Manager's contract period shall remain the Owner's property with a copy to be provided to BOW.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

Attest:

**OWNER:**
COCOA EXPO SPORTS CENTER, LLC,
A Florida limited Liability Company

Print Name:

David McFarlin

BY: J.C. Uhnerstall, Its Managing Member

14

Attest:                              **MANAGER:**

SPORTS FACILITIES MANAGEMENT, LLC,

A Florida limited Liability Company

Print Name:              BY: Jason Clement, Its Manager

## EXHIBIT A
## MANAGEMENT SERVICES

The Operational Management Services address the Manager's responsibility for all aspects of oversight for the staffing, marketing, maintenance, event management, sponsorship and advertising sales, and day-to-day operations of the Owner's Facility.

1. <u>Annual Business Plan</u>. Manager will produce an Annual Business Plan two months prior to the beginning of any Operating Year in the Term, Manager shall update the Business Plan and submit the revised Business Plan to Owner. The Business Plan shall be based on the Pro Forma prepared by Manager previously, which will be the first priority undertaken by the management following execution. The Business Plan for the first full Operating Year shall be submitted to Owner no later than __, 2017.

2. <u>Employment Matters</u>. Manager shall present the then current staffing, the incentive bonus plan for employees, and all salaries and payments to employees through the Payroll Account in the Annual Operations Budget. It is understood by all parties that reductions and additions to various positions may be made at Manager's discretion throughout the year due to business tempo, trends, opportunities, and budget requirements.

3. <u>Accounting Records and Reporting</u>.   During the Term Manager shall maintain professional accounting records in a format consistent (in all material respects) with standard accounting practices. Manager shall provide the financial statements to Owner and BOW on a monthly basis. However periodic information will always be available to Owner through the onsite accounting staff and Manager.

INTERNAL CONTROL. Manager agrees to develop, install, and maintain reasonably appropriate accounting, operating, and administrative controls governing the financial aspects of the Facility, such controls to be consistent with standard accounting practices.

BANK ACCOUNTS. Manager shall establish, in Facility's name, at a banking institution or institutions selected by Manager in writing, utilizing the federal tax identification number of Facility, an operating expense account (the "Operating Expense Account"). Manager shall establish, in Manager's name or in the name of its affiliate entity,  at a banking institution or institutions reasonably selected by Manager,  utilizing the federal tax identification number of Manager or its affiliate, a payroll account (the "Payroll Account").

ACCOUNT FUNDING. Subject to Manager's written notices to Owner as herein, Owner acknowledges that it is solely responsible for all Operating Expenses and capital expenditures required for or on behalf of the Facility provided that such Operating Expenses and capital improvements are made in accordance with the terms of this Agreement.

**EXHIBIT B**
**COMPENSATION**

During the Term of this Agreement, Manager shall be compensated as follows:

Base Monthly Fee. Beginning with the Effective Date and during the remainder of Term, Owner shall pay to Manager Twenty Thousand Dollars ($20,000) per month. Each installment is due and payable on the first day of each successive month.

Notwithstanding the foregoing Base Fee payments, Owner shall pay the first One Hundred Twenty Thousand Dollars ($120,000) upon the execution of this Agreement, to be applied by Manager as an advance toward payment of the final installments for the Base Monthly Fee of this Agreement.

Performance Incentive/Deferred Management Fee. To encourage Manager to grow revenues the Incentive/Deferred Management Fee portion provides additional compensation over the base monthly fee identified above. Once Total Gross Revenue exceeds $2 million for an Operating Year, then during the next Operating Year, Manager shall receive a performance fee equal to the lesser of: a) 3% of Total Gross Revenue for the month; and b) net income for the month. . Such calculations shall be made by Manager within 30 days of the ending of any operating month and paid to Manager within 30 days of such calculation being delivered to Owner.

Reimbursed Expenses. Manager shall be reimbursed for travel and other expenses directly related to the Management Services.   All travel reimbursement will be based on receipts to be furnished by Manager to the Owner. Travel expenses may include but are not limited to airfare, rental cars, parking fees, lodging and meals. All fees and reimbursements shall be paid to Manager within thirty (30) calendar days of invoicing. Manager will make a good-faith effort to keep these travel expenses to a minimum.

Owner will pay Manager for the actual cost of the full time employees' salary plus any other benefits and expenses incurred by Manager as a result of employing the staff members.

Sponsorship and Advertising Incentive. Due to the role that Manager will play in organizing the programs, negotiating agreements and pricing, and providing confidence to sponsors and advertisers, Manager will receive 20% of the gross revenue for sponsorship and, including facility-naming rights for all sponsorship and advertising sold throughout the life of Manager's service and contract to manage the facility.  All amounts paid to Manager shall be owed and payable as Owner receives each respective amount or like items in kind for any given time period.

Manager will also be paid 20% of the total cost savings for sponsored equipment, scoreboards, fencing, or other budgeted items that are donated to the project as a sponsorship effort by the vendor or supplier.   This will apply only if the item has been budgeted for and where the Owner has approved such budgeted items and where negotiations with a vendor result in a direct cost savings in trade for a sponsorship or promotion of the vendor at the facility site.  As an example, if the Manager is responsible for negotiating the donation of a bleacher by the bleacher supplier in trade for mention in the Printed Marketing Materials and the budgeted cost for the bleacher is $2,000.00 resulting in a direct cost savings of $2,000.00 - the Manager would receive $400.00.

Owner must approve all sponsorship and advertising agreements including those provided by suppliers and vendors that exceed a value of $15,000 a year.   In the event that Owner does not approve the Sponsorship or advertising arrangement, the Manager will not proceed with the Agreement and Manager will not receive a commission or compensation for the arrangement.  Payments will be made to Manager within thirty (30) days of the time when a sponsor/advertiser makes payment.

Sale of Facility Incentive. Manager is regularly in contact with prospective developers and buyers of sports complexes.  If during the Term of this Agreement, Manager procures a Buyer, directly or indirectly, and the Owner agree to terms for the purchase of all or a portion of the Owner's interest in the Facility, Manager will be paid a fee equal to 3% of the total sale price.

The full amount of Manager's Sale of Facility Incentive fee will be 3% of the total sale price for the operating company or any portion of either that is sold. This fee shall be paid to Manager within 30 days of closing.

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

        Chapter 11

Cocoa Expo Sports Center, LLC,      Case No.: 6:17-bk-00441-RAC

      Taxpayer ID No. 27-4509245,

      Debtor.
_____/

**SUBJECT TO OBJECTIONS, DEBTOR'S SUMMARY OF
ESTIMATED PLAN PAYMENTS ON EFFECTIVE DATE**

| | |
|---|---:|
| Class III – Property Taxes | $428,000.00 |
| Class IV – UDF XIV SPE B, LLC | $139,704.50 |
| Class V – Urban Development Fund XXIII, LLC | $356,985.50 |
| Class IX – Armitage Plumbing, LLC | $4,389.88 |
| Class X – Board of County Commissioner | $38,250.00 |
| Class XI – City Electric Supply Company | $250,000.00 |
| Class XII – Fortiline Waterworks | $16,812.93 |
| Class XIII – M&M Electric of Central Florida, Inc. | $21,274.21 |
| Class XIV – Middlesex Paving, LLC | $250,000.00 |
| Class XV – Southern Fire Protection of Orlando, Inc. | $27,723.70 |
| Class XVI – Unsecured Claims | $312,000.00 |
| Fisher Rushmer, P.A. | $67,602.97[1] |
| Examiner Expense | $52,000.00 |
| US Trustee Fees | $10,400.00 |

---

[1] Subject to supplement, if any, pursuant to Local Rule 2016-1(c)(2)(iii).

**EXHIBIT B**