ORDERED.

Dated:  April 25, 2018

_____
Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re<br><br>JEFFREY C. UNNERSTALL,<br><br>    Debtor. | Case No. 6:17-bk-00336-KSJ<br>Chapter 11 |
| In re<br><br>COCOA EXPO SPORTS CENTER, LLC,<br><br>    Debtor. | Case No. 6:17-bk-00441-KSJ<br>Chapter 11 |

**MEMORANDUM OPINION PARTIALLY ALLOWING
ATTORNEYS' FEES OF CREDITOR BANK OF WASHINGTON**

This matter came before the Court at an evidentiary hearing on January 30, 2018, to consider Bank of Washington's Motion to Determine Post-Petition Amounts Due to Oversecured Creditor[1] under § 506 of the Bankruptcy Code,[2] Motion by Cocoa Expo Sports Center, LLC ("Cocoa") to Determine Fees,[3] and the Debtors' Post Trial Memorandum.[4] The Court will partially allow the requested attorneys' fees.

---

[1] Doc. No. 200. All Doc. No. citations refer to pleadings filed in Case Number 6:17-bk-00441-KSJ unless otherwise noted. Documents cited in the other bankruptcy will be cited like this: "Doc. No. __ in 6:17-bk-00336-KSJ."
[2] All references to the Bankruptcy Code refer to 11 U.S.C. § 101, *et seq.*
[3] Doc. No. 185.
[4] Doc. No. 226.

1

Unnerstall is a contractor and real estate developer.[5] Prior to bankruptcy, he owned Upland Investments, LLC ("Upland"); and he had a 90% interest in Cocoa, a 59% interest in Neptune Bay Apartments ("Neptune Bay"), and an 81% interest in Eztopeliz, LLC ("Eztopeliz").[6] Cocoa owns a fifty acre sports complex in Brevard County, and Eztopeliz owns vacant land in the same area.[7]

Bank of Washington (the "Bank") is based in Missouri.[8] It has a long history of partnering with Unnerstall to finance real estate projects.[9] It holds the first, second, and third mortgages on the Cocoa property.[10] The debt secured by the three mortgages (identified as Loan Nos. 1401,[11] 1402,[12] and 0701[13]) exceeds $11 million.[14] Unnerstall guaranteed each loan,[15] and Upland pledged all of its investments as additional security to the 1401 and 1402 loans.[16] The Bank holds also a promissory note that Eztopeliz executed for $6.5 million.[17] The note, which is identified as Loan No. 1701, was secured by a first mortgage upon the vacant land and guaranteed by Unnerstall.[18]

After Unnerstall and Cocoa (collectively, the "Debtors") defaulted on the loan obligations, the Bank started foreclosure proceedings.[19] Unnerstall then sought relief under Chapter 11 of the Bankruptcy Code on January 18, 2017,[20] and Cocoa filed a related Chapter 11 case on January 23, 2017.[21] The Bank filed claims in the Unnerstall and Cocoa bankruptcies for over $17 million

---

[5] *Id.*
[6] *Id.* at 1-2.
[7] *Id.* at 1.
[8] *Id.* at 2.
[9] *Id.* at 2.
[10] Doc. No. 200, p. 1.
[11] Claim No. 9.
[12] Claim No. 15.
[13] Claim No. 16.
[14] *Id.*
[15] Claim Nos. 6, 7, and 8.
[16] Doc. No. 200, p. 2.
[17] *Id.*
[18] Doc. No. 200, p. 2; Subject of Claim No. 3.
[19] Doc. No. 200.
[20] Doc. No. 1.
[21] Doc. No. 1 in 6:17-bk-00336-KSJ.

and $11 million, respectively.[22] The Bank is oversecured because the value of the real property securing the repayment of the debt exceeds $30 million.[23]

About nine months after the bankruptcy petitions were filed, the Court entered an Order Confirming the Amended Unnerstall and Cocoa Chapter 11 Plans (collectively, the "Plans").[24] The Plans provided for the sale of Neptune Bay to pay down the Eztopeliz loan.[25] Under the Plans, about $200,000 of the net proceeds was paid to unsecured creditors; the remaining balance was disbursed to Cocoa.[26] The Bank then filed this Motion to Determine Post-Petition Amounts Due to Oversecured Creditor under § 506(b) of the Bankruptcy Code.[27]

Parties have agreed on all issues relating to costs and interest rates as reflected in the Order Partially Granting Creditor's Motion.[28] The only remaining issue is how much the Debtors should pay to reimburse the Bank for expert witness fees and for attorneys' fees incurred from November 16, 2016, through January 30, 2018. The Bank was represented by five law firms and twelve lawyers, and seeks $391,336.5 in attorneys' fees.[29] The Bank also seeks $19,224.90 for expert witness fees. Under the loan documents, the Debtors must reimburse the Bank as an oversecured creditor for its *reasonable* attorneys' fees and costs.

Section 506(b) of the Bankruptcy Code authorizes a creditor to recover fees, costs, and other expenses if the creditor holds an over-secured claim.[30] Debtors/borrowers, however, are not responsible for ***un**reasonable* fees incurred by a creditor in collecting the debt.[31] Creditors can

---

[22] The Bank's claims in the Unnerstall bankruptcy totaled $17.689 million and $11.162 million in the Cocoa bankruptcy.
[23] *See* Doc. No. 226, pp. 14-15.
[24] Doc. No. 120 in 6:17-bk-00336-KSJ; Doc. Nos. 147, 162.
[25] *Id.* The sale closed on September 29, 2017.
[26] *Id.*
[27] Doc. No. 200.
[28] Doc. No. 232; Doc. No. 189 in 6:17-bk-00336-KSJ.
[29] *See* Doc. No. 222 and 225 (Excluding costs and interest, the Court added fees requested by each firm pursuant to Doc. No. 222, pp. 6-10, with the additional costs requested for the Expert Testimony as indicated in Doc. No. 225).
[30] *In re Jimenez*, 472 B.R. 106, 110 (Bankr. M.D. Fla. 2012).
[31] *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 879 (11th Cir. 1990).

hire as many and as expensive lawyers as they choose but they then can shift no unreasonable fees onto the debtor/borrower.

The lodestar analysis helps courts sort reasonable from unreasonable fees by initially multiplying the attorney's reasonable hourly rate by the number of hours reasonably expended.[32] A bankruptcy court can adjust and must explain the lodestar calculation, upward or downward, after considering the following twelve (12) factors laid out in *Johnson v. Georgia Highway Express, Inc.*:[33]

> (1) The time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[34]

Professionals, for example, must "exclude any excessive, unnecessary, or redundant hours from their fee applications."[35]

### Expert Recommendation

Bradley Saxton was retained by the Bank as an expert to opine on a reasonable fee due to the Bank's many lawyers.[36] Saxton suggested an overall reduction of about $36,180.[37] Debtors do not dispute the reasonableness of the hourly rate charged by the lawyers.[38] Mr. Saxton's testimony

---

[32] *Id.*
[33] 488 F.2d 714 (5th Cir. 1974) (abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 92, 109 S. Ct. 939, 944, 103 L. Ed. 2d 67 (1989)).
[34] *Id.* at 714.
[35] *In re Blue Stone Real Estate*, 487 B.R. 573, 577 (Bankr. M.D. Fla. 2013) (citing *Franklin v. Hartford Life Ins. Co.*, No. 8:07-cv-1400-T-23MAP, 2010 WL 916682, at *3 (M.D. Fla. March 10, 2010) and *ACLU of Ga. v. Barnes*, 168 F.3d 423 (11th Cir. 1999)).
[36] Doc. No. 225.
[37] A comparison of the Creditor's Attorneys' Fees and Costs Claimed against Loans (Doc. No. 222) with the Amended and Corrected Expert Adjusted Total Fees and Interests (Doc. No. 225) (excluding costs and interests).
[38] Doc. No. 226, p. 14.

and report[39] also confirmed the reasonableness of the hourly rate charged by all lawyers.[40] So, the only true issue is whether the number of hours spent by the lawyers was reasonable.

Mr. Saxton recommended an "across the board" cut to all law firms of ten percent, disregarding that some law firms performed efficiently and appropriately, and others did not.[41] The Court rejects the Expert's Report promoting an across the board cut and will analyze the fees sought by the five separate firms individually by applying the *Johnson* factors to each application.

## Foreclosure Counsel - Hurd Fees

Hurd, Horvath & Ross, PA ("Hurd") was hired by the Bank to pursue a foreclosure action against the vacant property secured by the Eztopeliz loan after the Debtors defaulted on the debt.[42] On January 7, 2017, the firm filed a foreclosure lawsuit in Brevard County.[43] Unnerstall then filed for bankruptcy on January 18, 2017, and Cocoa on January 23, 2017.[44] Debtors did not respond to the complaint or attend any hearing.[45] The firm is requesting $7,770 in fees.[46]

After the bankruptcy was filed, Hurd charged the Bank about $1,807 for additional fees even though the firm was not involved in any aspect of the bankruptcy case and no activity occurred in the foreclosure action because the automatic stay was in place.[47] A review of the billing invoices indicates the post-petition entries did not independently advance the bankruptcy case.[48] The Court took this factor in consideration to arrive at a final award.

Because the average hourly rate ($361.40) is not disputed, the next step is to determine the number of hours Hurd reasonably expended in filing and prosecuting a foreclosure complaint for

---

[39] Doc. No. 225.
[40] *See* Doc. No. 222 (lawyers and supporting staff charged between $250.00 to $361.40 per hour; expert witness charged $456.65 per hour).
[41] 1-30-18 Testimony of Mr. Saxton.
[42] Doc. No. 200, pp. 9-10; Doc. No. 196.
[43] *Id.*
[44] Doc. No. 1; Doc. No. 1 in 6:17-bk-00336-KSJ.
[45] Doc. No. 226, p. 7.
[46] Doc. No. 200, p. 9; Doc. No. 196, p. 1.
[47] Doc. No. 196, p. 7.
[48] *See id.*

5

eleven days before the bankruptcy was filed. After considering the *Johnson* factors, the Court finds the Hurd firm reasonably spent 17 hours on the foreclosure action at the undisputed average hourly rate of $361.40.[49] Hurd, therefore, incurred reasonable fees of $6,143.80, for which the Debtors are liable. The Bank, separate from the Debtors, may pay the unawarded fees to Hurd or any other firm. The Bank just cannot charge the Debtors for these "extra amounts."

## Receivership Counsel - Armstrong Fees

Armstrong Teasdale LLP ("Armstrong") is a Missouri based law firm hired to initiate a receivership lawsuit regarding the Cocoa loans (Loan Nos. 1401, 1402, and 0701).[50] The complaint was filed on January 11, 2017, only twelve days prior to the bankruptcy.[51] Debtors never answered, and no significant litigation occurred.[52] Yet, the Armstrong firm seeks $66,107 for 181.0 hours of legal services, mainly for researching, preparing, and filing a complaint.[53] The average hourly rate ($361.24) is not disputed,[54] and the next step is to determine the number of hours counsel reasonably expended in the receivership action. After reviewing the billing records, the Court finds the fees excessive. Armstrong employed multiple attorneys who performed duplicative work and who billed an unreasonable amount of hours, given the task at hand (preparing and filing a receivership complaint).

The factors outlined in *Johnson* were considered by this Court including the skill and labor required to file a receivership action, the time to draft a complaint, and the time required to research receivership issues. For instance, in this case:

- Different attorneys reviewed and repeatedly re-reviewed for extensive periods of time the same loan documents, complaint, and demand letter:[55]

---

[49] *See* Doc. No. 196, p. 1; Doc. No. 226, p. 14.
[50] Doc. No. 200, p. 10.
[51] Doc. No. 226, p. 6; *see also* Doc. No. 197.
[52] Doc. No. 226.
[53] Doc. No. 197, p. 1.
[54] Doc. No. 226, p. 14.
[55] Doc. No. 197, pp. 5-6.

- o On November 23, 2016, a staff member charged $135 to prepare a demand letter for delivery. On the same day, another attorney asserted $405 in fees to review the demand letter, which already had been reviewed multiple times, and to facilitate the letter for delivery.[56]
- o An attorney incurred about $2,646 for reviewing the receivership petition in December.[57] He then charged $1,510 for another review on January 11, 2017. On that same day, another attorney billed $2,552 for yet another review.[58]

- Attorneys charged excessive amounts for participating in the same conferences but also for having multiple conferences with each other.[59]

- The firm charged $7,571 six months *after* the bankruptcy was filed even though the Bank had retained two other law firms for bankruptcy counsel, the automatic stay was in place, and absolutely no activity occurred or ever would occur in the nascent receivership action.[60]

These are merely examples of the numerous times in which Armstrong charged excessive fees for mainly preparing a complaint and demand letter where no significant litigation occurred. After cutting fees that were excessive and patently unreasonable, the Court finds only 40 hours (not 181 hours) were reasonable at an undisputed average rate of $361.24.[61] Armstrong, therefore, incurred *reasonable* fees of $14,449.60.

### **Bankruptcy Counsel – Carmody and Fassett Fees**

The Bank hired two separate law firms to represent it in this bankruptcy action. Carmody MacDonald, P.C. ("Carmody") is a Missouri based law firm specializing in bankruptcy hired to assist the Bank with bankruptcy related matters.[62] The firm is asking for $65,942.50, representing 248 hours at a $266.06 average hourly rate.[63] Fassett, Anthony, & Taylor PA ("Fassett") is a Florida law firm retained by the Bank to "act as local Florida Bankruptcy counsel

---

[56] *Id.* at 6.
[57] *Id.* at 15.
[58] *Id.* at 23.
[59] *Id.* at 13, 24.
[60] *Id.* at 34.
[61] Doc. No. 197, p. 1; Doc. No. 226, p. 14.
[62] Doc. No. 200, p. 9.
[63] *Id.* at pp. 10-11; Doc. No. 198, pp. 1-2; Doc. No. 217 (supplemental affidavit).

to assist with Bankruptcy related matters."[64] The firm is asking for $94,339.50 in attorneys' fees representing 262 hours at an hourly rate of $360.10.[65]

The Court looked closely at this dual retention and found the two law firms largely duplicated the other firm's work. The additional services of the Missouri law firm, although likely an excellent firm able to independently handle the bankruptcy itself, were largely duplicative, unreasonable, and unnecessary. Here are just a few illustrative examples:

- Multiple attorneys from both law firms reviewed claims and the status of the bankruptcy.[66]

    o Both firms worked/reviewed the cash collateral motions and the Chapter 11 Plan numerous times.[67]
    o On May 17 and 18, 2017, Carmody charged approximately $500 to review the appointment of the Trustee, and about $825 to review the bankruptcy file.[68] On these same dates, Fassett billed $2,088 to review the file, attend a hearing, confer with the Trustee, and exchange emails.[69]
    o On May 22, 2017, Carmody charged $450 to "research issues raised by debtor's chapter 11 plan."[70] There is another entry by a different attorney of $825 to review the plan.[71] The same research apparently continued a few days later with an entry of $550.[72]

- Both firms attended hearings and mediations together and billed for preparation in anticipation of those meetings and for the meetings among themselves.

    o On February 28, 2017, two Carmody attorneys charged $375 and $425, respectively, to appear at the cash collateral hearing—both via telephone.[73] An attorney for Fassett, however, was present and billed $900.[74]
    o On March 30, 2017, Carmody billed $675 to attend another cash collateral meeting via telephone.[75] Local counsel again was present at the hearing and charged $1,152 for preparing and "attending hearing on use of cash collateral;

---

[64] Doc. No. 200, p. 9.
[65] *Id.* at 12-13; Doc. No. 195, pp. 1-2; Doc. No. 217 (supplemental affidavit).
[66] Doc. No. 195, pp. 7-8, 15-19; *see also* Doc. No. 198, pp. 11-14, 32-34.
[67] Doc. No. 195, p. 9, 12; Doc. No. 198, pp. 12, 14.
[68] Doc. No. 198, pp. 32-33.
[69] Doc. No. 195, p. 25.
[70] Doc. No. 198, p. 34.
[71] *Id.* at 36.
[72] *Id.* at 37.
[73] *Id.* at 14.
[74] Doc. No. 195, p. 12.
[75] Doc. No. 198, p. 19.

exchange emails with counsel regarding the same."[76]

- o Between February 24 and January 27, 2017, Carmody counsel charged about $375 to prepare for the meeting of creditors, then $2,625 to prepare and travel to the meeting of creditors, then $4,500 to appear in court and attend the meeting.[77] Fassett incurred $2,232 in fees to prepare and attend the same meeting.[78] Why did the Missouri counsel travel to Orlando if competent local counsel was present?

- o On March 21, 2017, Carmody billed $112.50 to email about the 341 meeting.[79] The next day, it incurred approximately $337 in fees to exchange emails and attend the continued meeting via telephone.[80] Fassett also charged $648 to prepare for the same meeting, and then $792 to attend it.[81] On April 17, 2017, Carmody billed $100 to attend the continued meeting, and Fassett about $396 for the same event.[82]

- o On June 14, 2017, Carmody charged $1,875 to meet with the Bank and to travel to Orlando from Missouri.[83] It charged $6,000 to attend mediation and to travel back to Missouri.[84] Local counsel, however, also attended mediation and billed $3,600.[85] Again, why did the Missouri counsel travel to attend the mediation if a competent local counsel was present?

- There are also multiple double charges for the attorneys to communicate about the same issue with one another and with Mr. Kuenzel, who is an attorney at the Eckelkamp law firm – yet another firm hired by the Bank.[86] A small example:

  - o On January 19, 2017, a Carmody attorney charged $450 to attend a conference with Mr. Kuenzel about the bankruptcy.[87] Fassett charged $540 for the same conference.[88]

These are merely examples of the numerous times two competent law firms billed for doing essentially the same work.[89] The Court is perplexed why the Bank needed two bankruptcy firms and why both firms did largely the same work as the other. Courts are uniform in denying

---

[76] Doc. No. 195, p. 16.
[77] Doc. No. 198, p. 14.
[78] Doc. No. 195, p. 12.
[79] Doc. No. 198, p. 19.
[80] *Id.*
[81] Doc. No. 195, pp. 15-16.
[82] Doc. No. 198, p. 27; Doc. No. 195, p. 19.
[83] *Id.* at 42.
[84] *Id.*
[85] Doc. No. 195, p. 31.
[86] Doc. No. 198, pp. 13, 19, 21, 33-34, 36, 41, 43-46; Doc. No. 195, pp. 24-26, 30-32, 35-36.
[87] Doc. No. 198, p. 7.
[88] Doc. No. 195, p. 7.
[89] *See also* Doc. No. 198 pp. 32, 41; Doc. No. 195, pp. 20, 24, 29 (both firms charged to review motions to appoint trustee, to attend the same conference with the examiner, etc.).

compensation for unnecessary and duplicative work. "Not all work performed by an attorney whose employment has been approved is compensable simply by virtue of the fact that the attorney has actually performed the work. The Court will disallow fees resulting from excessive time spent to complete a task."[90] "[C]ompensation will not be awarded for 'unnecessary duplication of services.'"[91]

The risk of duplication of services is great here because the Bank employed two firms to do the same job. And "where multiple law firms all work on some of the same matters, the requested fees will be carefully scrutinized to ensure that compensation is not allowed for an 'unnecessary duplication of services.'"[92] Here, either firm could have ably handled the bankruptcy, but the retention of two firms to do largely the same work is not reasonable.

Further, many entries on the Fassett bills had multiple services on a single time entry, making it impossible for the Court to determine the reasonableness of the specific charges. For example:

- On May 19, 2017, counsel billed $1,188 to "exchange emails with counsel regarding proposed conference call, work on draft Requests for Production, File and Serve Requests."[93] How long did counsel spend emailing about proposed call? How long did the attorney spend drafting? It is unclear.

Other bankruptcy courts have faced similar difficulties in assessing the reasonable hours a lawyer spent on a task. "Lumping is 'universally disapproved' by bankruptcy courts….The problem with lumping is that it hinders courts from determining reasonableness, which is why it goes hand in hand with the principal that a vague or inadequate record will warrant adjustments to the award."[94] Courts have taken different approaches to lumping.[95] Some courts deny the

---

[90] *In re First State Bancorporation*, No. 7-11-11916 JA, 2014 WL 1203141, at *4 (Bankr. D.N.M. Mar. 24, 2014).
[91] *Id.* (internal citations omitted). *See also In re Brous*, 370 B.R. 563, 573 (Bankr. S.D.N.Y. 2007) ("The estate did not require two sets of lawyers overseeing [a] transaction…The fees pertaining to these duplicative (and sometimes vaguely described) services will be disallowed, subject to two exceptions.").
[92] *In re First State Bancorporation*, 2014 WL 1203141 at *7 (internal citations omitted).
[93] Doc. No. 195, p. 25.
[94] *In re Parker*, No. 12-03128-8-SWH, 2015 WL 5095948, at *7 (Bankr. E.D.N.C. Aug. 27, 2015).
[95] *Id.*

entry altogether while others "make a percentage adjustment."[96] Here the Court has taken the lumping into consideration to arrive at a final fee award.

After considering entries that were duplicative, patently unreasonable, and difficult to assess, the Court finds the reasonable hours Carmody and Fassett spent in this bankruptcy are 124 and 131 hours at an undisputed average hourly of $266.06 and $360.10,[97] respectively. Carmody, therefore, incurred reasonable fees of $32,991.44 and Fassett of $47,173.10.

### General Counsel - Eckelkamp Fees

Eckelkamp Kuenzel, LLP (Eckelkamp) is a Missouri based law firm that acted as the Creditor's "in-house" counsel.[98] It is asserting fees for $157,177.[99] The Court cannot ignore the interconnected relationship between the Bank and its own law firm. The officers of the Bank are both the clients of the law firm and the lawyers at the firm. The Chairman and CEO of the Bank, L.B. Eckelkamp, is a founder of the Eckelkamp law firm.[100] His son, L.B. Eckelkamp Jr., is a president of the Bank and also an attorney at the firm.[101]

Approximately $23,327 are for fees incurred before the bankruptcy petition was filed.[102] Most charges either lumped multiple services into a single entry, overlapped with the receivership action handled by the Armstrong firm, or were for "extensive and very lengthy meetings."[103] Besides the lumping and duplicate entries, the Court could not analyze under the *Johnson* factors, the reasonableness of what was the point of the multiple "very lengthy meetings" and more important, why the Debtors should pay for these very lengthy meetings.

Other bankruptcy courts have faced similar problems and they do the best job possible with the limited information provided. "A starting point for an evaluation of the reasonableness

---

[96] *Id.*
[97] Doc. No. 198, p. 1; Doc. No. 195, p. 1; Doc. No. 226, p. 14.
[98] Doc. No. 200; Doc. No. 226, p. 8 (Creditor does not dispute these allegations).
[99] Doc. No. 199, pp. 1-2; Doc. No. 217, pp. 1-2.
[100] Doc. No. 199.
[101] Doc. No. 226, p. 8 (Creditor does not dispute these allegations).
[102] *Id.* at 13-18.
[103] *Id.*

of the fees is an explanation that discloses what was done, when it was done, by whom it was done, and how long it took …Time entries must be both detailed and specific…A lack of detail justified reduction or denial of compensation."[104] "Adequate time records are essential to the court in carrying out its duty to determine how much work was productive or necessary, and how much work required treatment by experienced attorneys."[105] Here, descriptions such as "very lengthy meetings" are not helpful.

After eliminating entries that lumped time, failed to describe services, or that duplicated services, the Court finds that 30 hours were reasonably spent pre-petition to "coordinate the efforts of the various state court actions."[106] Eckelkamp, therefore, is awarded prepetition fees of $10,500.

The firm is seeking also fees for approximately $149,407 for work done in connection to this bankruptcy[107] even though the Bank already had hired two law firms to handle the bankruptcy work. After careful review of the record, the Court found that most entries did not independently advance the bankruptcy besides the work already being performed by Fassett and Carmody. For example:

- There are multiple entries to "review" the record even though Fassett and Carmody each had reviewed the same documents.[108]

- Eckelkamp charged to attend hearings where two competent law firms already were inexplicably representing the Bank. A small example:

    o There is an approximate $10,000 dollar charge to prepare and attend the 341 meeting[109] when Carmody had incurred about $7,500[110] and Fassett $2,232 to essentially do the same work.[111]

---

[104] *In re Castorena*, 270 B.R. 504, 515 (Bank. D. Idaho 2001).
[105] *In re Sapolin Paints, Inc.*, 38 B.R. 807, 810 (Bankr. E.D.N.Y. 1984).
[106] *See* Doc. No. 199, pp. 1-2; Doc. No. 226, p. 14.
[107] Doc. No. 199, pp. 1-2; Doc. No. 217, pp. 1-2.
[108] Doc. No. 199 pp. 4-12, 19-39, 41-47.
[109] *Id.* at 23-24 (there are multiple entries in connection with the 341 at the undisputed average rate of $350).
[110] Doc. No. 198, p. 14
[111] Doc. No. 195, p. 12.

Why did the Bank need three law firms in a bankruptcy rapidly confirmed with no major problems? Perhaps, as Unnerstall testified, the Bank was trying to crush him with fees.[112] Perhaps, as the Debtors' attorney stated in Court, the Bank's attorneys saw a "golden ticket" in a rare case where the Chapter 11 creditor was oversecured by millions. Whatever the reason, given the experience and the competency of each individual law firm, the Court is appalled by this unnecessary duplication and effort.

Further, both the CEO and the president of the Bank are attorneys at the Eckelkamp law firm. Given the incestuous nature of the relationship between the Bank and the law firm,[113] and that the Bank had already unnecessarily hired two law firms to work on this bankruptcy besides "their own firm," the Court will allow only a small portion of the post-petition fees asserted by Eckelkamp to recognize the Bank perhaps needed legal oversight of its bankruptcy lawyers. In allowing this amount, the Court still ponders why a Bank needed separate lawyers to oversee other lawyers. Isn't this something banking officers handle independently? For these services, Eckelkamp reasonably (and perhaps generously) spent 30 hours at a $350 per hourly rate for $10,500. Therefore, the Debtors must reimburse the Bank for $21,000 reasonably billed by the Eckelkamp firm.

## Expert Fees

The Bank hired Mr. Saxton as an expert in this case.[114] Mr. Saxton is asserting $19,224.90[115] in fees for preparing his report and for testifying.[116] The Bank now asks the

---

[112] 01-30-18 Testimony of Unnerstall.
[113] Courts are reluctant to award fees to "in house" counsel where counsel acted only as a liaison between the client and the outside counsel. *See, e.g.*, *Burger King Corp. v. Mason*, 710 F.2d 1480, 1498 (11th Cir. 1983) ("'Attorney's fees for the services of in house counsel are not recoverable…Cases from other jurisdictions awarding fees for the services of in-house counsel who actively tried the case are not factually similar to this case when in-house counsel acted primarily as a liaison between the client and outside counsel who had complete responsibility for the conduct of the case.'"); *F.D.I.C. v. Bender*, 182 F.3d 1, 5 (D.C. Cir. 1999) ("'Of course, if in-house counsel are not actively participating (e.g., acting only as liaison), fees should not be awarded.'") (internal citations omitted).
[114] Doc. No. 225.
[115] *Id.* at 3.
[116] *Id.*

Debtors to pay this expert witness fee.[117] Debtors object and state Bankruptcy Rule 7054(b)(1) allows taxation of costs only to the prevailing party; the Bank is not a prevailing party.[118] Even then, Debtors argue, 28 U.S.C. § 1920 would not include expert witness expenses under the allowable tax cost list, which provides:

> A judge or clerk of any court of the United States may tax as costs the following:
> (1) Fees of the clerk and marshal;
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under Section 1828 of this title.

The witness fees specified above are defined in 28 U.S.C. § 1821:

> (b) A witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.

Expert witness fees are not generally taxable. Section 506(b) of the Bankruptcy Code authorizes a creditor to recover post-petition fees, costs, and other expenses if the creditor holds an oversecured claim, but § 1920 still constitutes the statutory parameter for determining costs allowed in federal courts. "In the Federal Judicial System fees of witnesses which may be taxed as costs are governed by … § 1920 (3), and... § 1821. The fees allowable to witnesses under these statutes are limited to the statutory per diem, mileage, and subsistence allowance where appropriate."[119] Assuming the Bank "won" and is the prevailing party, the Debtors do not have to pay untaxable costs, like expert witness fees.

---

[117] *Id.*
[118] Doc. No. 226, p. 17.
[119] *Matter of George Hunt, Inc.*, 75 B.R. 143, 144 (Bankr. M.D. Fla. 1987) (internal citations omitted); *see also Wells Fargo Bank, N.A. v. Kendrick (In re Kendrick)*, No. 13-00017, 2013 WL 4518654, at *4 (Bank. M.D. Fla. Aug. 27, 2013); *Alexander v. Horton, et al. (In re Terry Manufacturing Co., Inc.)*, No. 03-32063, 2007 WL 1491086, at *3 (Bankr. M.D. Ala. May 21, 2007); *Bishara v. O'Callaghan (In re O'Callaghan)*, 304 B.R. 887, 889-90 (Bankr. M.D. Fla. 2003); *Fountain Trust Co. v. Kochell (In re Kochell)*, 36 B.R. 766, 768 (Bank. E.D. Wis. 1984).

In *Crawford*, the Supreme Court stated, "absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920."[120] Similarly, the Eleventh Circuit has said that "it is well settled that expert witness fees cannot be assessed in excess of witness fees provided in § 1821."[121]

Although some courts have not applied these principles to cases falling under the Bankruptcy Code and have awarded fees to experts, "these decisions disregarded 28 U.S.C. § 1821 and § 1920, and the holding of *Henkel* [where the Supreme Court found federal courts have no power to tax costs of expert witness fees], and justified a taxation of the fees of an expert on the basis that the…'language of the statute'… permitted a reasonable attorney fee."[122]

Here, the Bankruptcy Code does not explicitly authorize for the taxation of expert witness fees. The Bank provided no evidence indicating the Debtors are contractually obligated to pay not just attorneys' fees and taxable costs, but also expert witness fees; and, there are no exceptional circumstances present in this case to justify the award of costs not allowed under applicable law.[123] Because Mr. Saxton testified but was not a court appointed expert,[124] he may have a modest attendance fee of $40 dollars under 28 U.S.C. § 1821. The Bank may and likely must pay Mr. Saxton. Under applicable law, however, the Bank cannot shift this cost to the Debtors.

---

[120] *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S. Ct. 2494, 2499, 96 L. Ed. 2d 385 (1987); *see also Henkel v. Chicago, St. Paul, M. & O.R. Co.,* 284 U.S. 444, 52 S. Ct. 223, 76 L. Ed. 386 (1932) (finding federal courts have no power to tax costs of expert witness fees).
[121] *Kivi v. Nationwide Mut. Ins. Co.*, 695 F.2d 1285, 1289 (11th Cir. 1983) (internal citations omitted).
[122] *Matter of George Hunt, Inc.*, 75 B.R. at 144.
[123] *In re O'Callaghan*, 304 B.R. at 887 (finding no exceptional circumstances to justify non-compliance); *In re Kochell*, 36 B.R. at 768 (finding no exceptional circumstances); *but see In re Celotex Corp.,* 251 B.R. 163, 165 (Bankr. M.D. Fla. 2000) (exceptional circumstances).
[124] *Crawford*, 482 U.S. at 442 ("[Section] 1920(6) allows the taxation, as a cost, of the compensation of court-appointed expert witnesses. There is no provision that sets a limit on the compensation for court-appointed expert witnesses in the way that § 1821(b) sets a limit for litigants' witnesses. It is therefore clear that when Congress meant to set a limit on fees, it knew how to do so.").

**Conclusion**

The Bank is oversecured. Debtors therefore must pay the Bank's reasonable attorneys' fees under § 506(b) of the Bankruptcy Code. According to the lodestar analysis, however, the Debtors are not responsible for unreasonable fees incurred by the Bank in collecting the debt. After carefully reviewing each fee application under the reasonableness test outlined in *Johnson*, the Court will allow these amounts for the fee applications: (1) Hurd - $6,143.80; (2) Armstrong - $14,449.60; (3) Carmody - $32,911.44; (4) Fassett - $47,173.10, (5) Eckelkamp - $21,000.00; and (5) Witness Fee - $40.00, for a total award of $121,718. Debtors must reimburse the Bank for these reasonable attorneys' fees. The balance requested is determined unreasonable, and the Debtor has no financial responsibility for these amounts. The Court then will allocate the total award of $121,718 among the loans using the parties' percentages:[125]

| Loan | Percentage of Fees | Allowed Amount |
| --- | --- | --- |
| **1701** | 23.22% | $28,264.5 |
| **1401** | 25.80% | $31,408.4 |
| **1402** | 30.18% | $36,736 |
| **0701** | 20.79% | $25,309.5 |

### 

Attorney, Phil A. D'Aniello, is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of this order.

---

[125] *See* Doc. No. 200, p. 13 (average percentage was calculated based on the table provided by the Bank).